IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA,

v.                                                   CRIMINAL ACTION NO. 2:19-cr-00022

JASON WATTIE BUZZARD


MEMORANDUM OPINION AND ORDER

Pending before the court is the defendant's Motion to Suppress [ECF No. 20]. The court held a hearing on this Motion on April 24, 2019, and ordered additional briefing. The defendant and the government have submitted additional briefs, and the matter is now ripe for review. For the following reasons, the Motion is **DENIED**.

I.    Background

The defendant seeks to suppress several items of evidence that he claims were unlawfully seized. At the suppression hearing, the court heard testimony of Paul Martin, Defendant Jason Buzzard, and Officer Tyler Dawson. The parties agree that on October 12, 2018, the defendant was leaving a gas station at approximately 1:36 a.m. when Officer Dawson stopped the defendant because of a defective brake light.

Officer Dawson testified that he made contact with Defendant Buzzard, the driver, and testified that during these kinds of traffic stops, he "[a]lways advise[s] [the driver] why [he] stopped them and then [he] always ask[s] for license and

registration, proof of insurance." Tr. Mot. Suppress 8:3–4. Officer Dawson testified that while Defendant Buzzard was searching for the vehicle's registration and insurance, Defendant Buzzard stated that the vehicle was not his. *Id.* at 8:9–10. Officer Dawson testified that he observed the passenger, Mr. Martin, appearing as if he were about to run. *Id.* at 15:1–3. Officer Dawson explained that Mr. Martin was moving and looking around and not making eye contact, but interrupting him while he was speaking with Defendant Buzzard by saying things like "Hey, you know me, we're not up to anything. It's just me." *Id.* at 10–11. He stated that Mr. Martin would lean forward, back, look right and look left. He explained that it was uncommon for passengers to act the way that Mr. Martin was acting; most people, he said, would sit still in their seat and listen to and watch the officer. *Id.* at 11:7–24. He testified that he knew Mr. Martin from three other encounters. One included Mr. Martin riding his bike around some vehicles late at night, where Officer Dawson suspected that Mr. Martin might be breaking into cars. *Id.* at 8. The second was a run in at Thomas Memorial Hospital where Mr. Martin was being treated for drug addiction. *Id.* at 9. And the third was when Officer Dawson responded to a domestic dispute involving Mr. Martin. *Id.* at 35:13–24. He explained that at the time of the stop, he knew that Mr. Martin had a history of drug addition, that he just got out of prison, and that he had prior felonies. *Id.* at 9–10.

Officer Dawson went on to testify that the area where he pulled over the defendant was what he believes to be a high crime area, commonly involving

narcotics, noting dozens of arrests made by him alone. *Id.* at 12. He explained a drug trade practice of using the gas station wi-fi to set up deals and noted a known drug house within a block of the stop. *Id.*

Officer Dawson testified that in a normal situation, he would run the driver's information—i.e., Defendant Buzzard's driver's license information and a warrant check. He did not, however, run these routine checks. *Id.* at 14. Officer Dawson testified that because there were two persons in the car, he decided to wait for an additional officer. *Id.* at 14–15. Notably, he did not call for backup specifically as much as he hoped for a second officer to arrive. He explained that when someone begins a stop, his shift's practice is to say, "Hey, I've got two occupants in the vehicle," and normally, another officer listening in will come to the scene. *Id.* at 15. Assuming that a second officer would arrive, Officer Dawson decided to wait, and while waiting, he asked Defendant Buzzard a single question: Is there anything illegal in the vehicle? Indeed, Officer Dawson's field case report states as follows:

> I made contact with the driver/suspect Jason Buzzard . . . . I observed the other suspect, Paul Martin . . . , sitting in the front passenger seat of the suspect vehicle. While speaking with Buzzard, I asked if he had anything illegal in the vehicle.

Police Report [ECF No. 32-1] 2. When defense counsel asked Officer Dawson why he asked that single question, Officer Dawson said that he asked it based on the time of night, the location, Mr. Martin's history, and Mr. Martin's behavior. Tr. Mot. Suppress 15.

On the other hand, Defendant Buzzard and Mr. Martin, after being sequestered, separately testified that the first question that Officer Dawson asked immediately after approaching the car for the first time was whether there was anything illegal in the car. Regardless of the timing, once asked, Defendant Buzzard produced a bowl of marijuana that was hidden under his shirt. Mr. Martin told Officer Dawson that he had one too and would eventually surrender a syringe. After a search of the car, Officer Dawson found two firearms, one hidden under the driver's seat and the other hidden under the passenger's seat. The police arrested Defendant Buzzard and Mr. Martin and also confiscated Defendant Buzzard's cell phone.

Defendant Buzzard moved to suppress the contraband. He argues that the question "Is there anything illegal in the vehicle?" was beyond the scope of the purpose of the stop and that by asking it, the question unlawfully prolonged the stop. Consequently, he argues that in order to ask the "unrelated" question, Officer Dawson needed reasonable suspicion or the defendant's consent. The defendant does not challenge the lawfulness of the traffic stop. Both parties agree that Officer Dawson lacked consent. The court is presented with two questions: whether the single question was related to the mission of the stop, and if not, whether the single question unlawfully prolonged the stop.

## II.   Legal Standard

When deciding a motion to suppress, the district court may make findings of fact and conclusions of law. *United States v. Stevenson,* 396 F.3d 538, 541 (4th Cir.

2005). During the hearing, "the credibility of the witness[es] and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. McKneely,* 6 F.3d 1447, 1452–53 (10th Cir. 1993) (quoting *United States v. Walker,* 933 F.2d 812, 815 (10th Cir. 1991)). *See also Columbus–Am. Discovery Grp. v. Atl. Mut. Ins. Co.,* 56 F.3d 556, 567 (4th Cir. 1995) ("[I]n the usual case, the factfinder is in a better position to make judgments about the reliability of some forms of evidence than a reviewing body acting solely on the basis of a written record of that evidence. Evaluation of the credibility of a live witness is the most obvious example.") (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.,* 508 U.S. 602, 623 (1993)). The burden of proof is on the party who seeks to suppress the evidence. *United States v. Dickerson,* 655 F.2d 559, 561 (4th Cir. 1981). Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence. *United States v. Matlock,* 415 U.S. 164, 177 n.14 (1974).

### III.   Discussion

"[I]n determining whether a traffic stop is reasonable, [courts] apply the standard articulated in *Terry v. Ohio*, 392 U.S. 1 (1968), wherein the court asks (1) if the stop was 'legitimate at its inception,' *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017), and (2) if 'the officer's actions during the seizure were reasonably related

in scope to the basis for the traffic stop,' *Williams*, 808 F.3d at 245." *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018).

Taking these principles into account, in this case, the officer asked a single question, whether there was anything illegal in the car. Police Report [ECF No. 32-1] 2. The first question before the court is whether this question was related to the mission of the stop. The second question before the court is if the question was not related to the mission of the stop, whether the single question unlawfully prolonged the stop.

### a. Whether the Question was Related to the Mission of the Traffic Stop

The United States Supreme Court has made clear that because "traffic stops are 'especially fraught with danger to police officers,'" an officer "may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Rodriguez v. United States*, 135 S. Ct. 1609, 1616 (2015) (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)). "Unlike a general interest in criminal enforcement, however, the government's officer safety interest stems from the mission of the stop itself." *Id.* at 1616. For instance, an officer may order the driver out of the car for safety purposes because officer safety weighs greater than the "'de minimis' additional intrusion of requiring a driver, lawfully stopped, to exit a vehicle." *Id.*

(citing *Pennsylvania v. Mimms*, 434 U.S. 106, 110–11 (1977)); *see also Maryland v. Wilson*, 519 U.S. 408, 413–15 (expanding *Mimms* to include all passengers).

In addition, "an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Rodriguez*, 135 S. Ct. at 1615 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.*

In this case, the officer asked the single question, whether there was anything illegal in the car. Police Report [ECF No. 32-1] 2. Because the question is related to officer safety, the question is therefore related to the mission of the stop itself. *See Rodriguez*, 135 S. Ct. at 1615. The question could expose dangerous weapons or narcotics. Courts have already recognized the authority of "officers conducting a traffic stop [to] inquire about dangerous weapons." *United States v. Everett*, 601 F.3d 484, 495 (6th Cir. 2010) ("[I]t would be irrational to conclude that officers cannot take the 'less intrusive [measure]' of 'simply [asking] whether a driver has a gun.'"); *see also Johnson*, 555 U.S. at 327 (finding that a stop, which included the officer asking if there were any weapons in the vehicle, was a legitimate stop). This single question is certainly less intrusive than ordering the driver and passengers out of the car. *See Mimms*, 434 U.S. at 110–11; *see also Wilson*, 519 U.S. at 413–15. As another court

has reasoned, "If a police officer may, in the interest of officer safety, order all occupants out of the vehicle for the duration of the stop without violating the Fourth Amendment, the officer may take a less burdensome precaution to ensure officer safety." *State v. Wright*, 2019 WI 45, 926 N.W.2d 157, 163.

Further, asking generally if illegal items are in the vehicle relates to highway safety at least as much as searching for traffic warrants to ensure that "vehicles on the road are operated safely and responsibly" or to "make[] it possible to determine whether the apparent traffic violator is wanted for one or more previous traffic offenses." *Rodriguez*, 135 S. Ct. at 1615. Indeed, Officer Dawson's question would be much more likely to dispel safety concerns than a database of past potentially criminal conduct. It is also increasingly more likely that the single question would dispose of related concerns than a warrant for a "previous traffic offense," and certainly more likely to ensure the vehicle is operating safely and responsibly than checking the registration and proof of insurance. *See Rodriguez*, 135 S. Ct. at 1615.

### b. Whether the Question Unlawfully Prolonged the Stop

The "Fourth Amendment tolerate[s] certain unrelated investigations that [do] not lengthen the roadside detention." *Id.* at 1614 (citing *Johnson*, 555 U.S. at 327–28; *Caballes*, 543 U.S. at 406, 408) (brackets added). "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop," but "he

may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.*

Even assuming here that the single question, whether there is anything illegal in the car, was not related to the mission of the traffic stop, the question did not violate the Fourth Amendment because it did not lengthen the traffic stop. This is true whether or not the question was asked initially, as the defendant argues, or after initiating contact with the defendant, as the government argues. In either scenario, the question was asked concurrently with the traffic mission related activities. The defendant relies on *Rodriguez* to argue the question unconstitutionally extended the stop. However, the temporal significance *Rodriguez* places on police actions for dog sniffs is impractical as it pertains to officer questioning. *Rodriguez* answered the question whether a dog sniff is allowed if it extends a traffic stop, even if for a few minutes. *Id.* at 1612–17. *Rodriguez* specifically distinguished police questioning from dog sniffs. *Id.* at 1615 ("A dog sniff, by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Indianapolis v. Edmond*, 531 U.S. 32, 40–41 (2000)). Justice Alito noted in his dissent in *Rodriguez* that "it remains true that police may ask questions aimed at uncovering other criminal conduct and may order occupants out of their car during a valid stop." *Id.* at 1625 n. 2 (Alito, J., dissenting). Unlike prolonging a traffic stop for a dog sniff, a single question is such a de minimis

extension of time that it likely cannot be measured. Therefore, the single question could not have measurably prolonged the stop.

The Fourth Circuit has found that asking unrelated questions while waiting for a background check did not prolong the stop.[1] *See United States v. Green*, 740 F.3d 275, 281 (4th Cir. 2014) (finding that officers "brief questioning about matters unrelated to the traffic violations did not run afoul of the scope component of *Terry's* second prong" when asked during a criminal history check). The Fourth Circuit said again in *Bowman* that "police *during the course of a traffic stop* may question a vehicle's occupants on topics unrelated to the traffic infraction." *United States v. Bowman*, 884 F.3d 200, 210 (4th Cir. 2018) (citing *Johnson*, 555 U.S. at 333 (2009)). In addition, commentators have noted that brief questioning may not prolong a stop when an officer interrogates a single motorist while checking the motorist's documents or awaiting a criminal history or outstanding warrant check. *See* Tracey Maclin, *Anthony Amsterdam's Perspectives on the Fourth Amendment, and What It Teaches About the Good and Bad in Rodriguez v. United States*, 100 MINN. L. REV. 1939, 1983 (2016). Here too, Officer Dawson's single, noninvasive, general question related to officer and highway safety asked while the defendant had yet to produce

---

[1] While the Fourth Circuit in *United States v. Ortiz*, 110 F.3d 61 (4th Cir. 1997) (unpublished table decision), found that an officer was justified in inquiring wither the defendant had anything illegal in the car *because* he had reasonable suspicion, being decided before *Rodriguez*, *Ortiz* did not evaluate (1) whether the officer's question was within the scope of the mission or (2) whether the officer's question unlawfully prolonged the stop. Nor did it need to with a finding of reasonable suspicion.

registration and insurance did not prolong the stop any longer than reasonably necessary to complete the stop's mission.

Further, merely asking a general, broad question about whether anything illegal is in the car does not begin a new investigation into other crimes. Officers can always make general inquires; such general inquiries do not prolong traffic stops. "Anything illegal in the car?" is an incidental question furthering legitimate law enforcement goals. Such a question cannot be held to begin a new investigation into other crimes.

I cannot find that Officer Dawson's single question violated the defendant's Fourth Amendment rights and should invoke the extraordinary remedy of the exclusionary rule. *See Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (Exclusion "has always been our last resort, not our first impulse."). I **FIND** that Officer Dawson's single question was a constitutionally permissive question that not only was within the scope of a traffic stop's mission, but also did not unlawfully extend the defendant's seizure. Accordingly, because Officer Dawson's question was both within the scope of the mission and within the time reasonably necessary to complete the stop, a finding of reasonable suspicion is unnecessary.

## IV.   Conclusion

For the foregoing reasons, the defendant's Motion to Suppress [ECF No. 20] is **DENIED.** The court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to the defendant and counsel, the United States Attorney, the United

States Probation Office, and the United States Marshal. The court further DIRECTS the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER: September 3, 2019

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE